585 So.2d 693 (1991)
Dwayne VEAL
v.
STATE of Mississippi.
No. 07-KA-59427.
Supreme Court of Mississippi.
August 7, 1991.
*694 Arnold F. Gwin, Greenwood, for appellant.
Mike C. Moore, Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and PITTMAN, JJ.
ROBERTSON, Justice, for the court:

I.
Dwayne Veal has been convicted of the attempted sexual battery of a seven-year-old female child. Veal appeals, challenging the weight of the evidence against him and charging further that the trial court erred when it denied his motion to suppress his confession. We have reviewed the points with care and, finding no error requiring reversal, we affirm.

II.

A.
On the evening of April 23, 1987, L.E.H. contacted the Leflore County Sheriff's Department and reported that her seven-year-old daughter, B.A.H., had been sexually assaulted by Dwayne (Pee Wee) Veal earlier that afternoon. L.E.H. came into the Sheriff's Office shortly thereafter and made a sworn formal complaint. The time was somewhere between 10:30 and 10:50 p.m. A dispatcher with the Sheriff's Department called Justice Court Judge Johnny Collins, who lives in Itta Bena, and Judge Collins came to the Sheriff's Office in Greenwood. Based upon L.E.H.'s complaint and the other information afforded him, Judge Collins issued a warrant for Veal's arrest.
Deputy Sheriff Alfred King then went to the Rising Sun Community in Leflore *695 County where Veal lived with his father. Deputy King placed Veal under arrest, took him into custody, and transported him to the Sheriff's Office. Veal's father followed behind. Judge Collins was still present at the Sheriff's Office when all arrived.
Chief Deputy Sheriff Jerry Carver supervised interrogation of Veal. Without doubt, Carver advised Veal of his Miranda rights.[1] At approximately 12:50 a.m. on April 24, 1987, Veal acknowledged these rights and signed a waiver thereof. At the suppression hearing, Veal admitted he was advised of his right to remain silent and of his right to have an attorney present during questioning, but that he waived these rights.
They read me my rights. They read me my rights. They didn't get  they ain't hollering at me or nothing like that. They talked to me nice. Then they read me my rights, and they said, "Do you need a lawyer?"
Veal answered, "No."
Sometime between 1:33 a.m. and 1:51 a.m., Veal made and signed a short written statement:
Yesterday at about 4:30 p.m. I called ... [B.A.H.] to come to the utility room for the purpose of having sex with her. I had asked her to bring a pack of potato chips from Mrs. Mary. She did not get the chips. I got her inside the utility room and took her clothes off. I pulled my pants down and tried to put my penis inside her. I couldn't get it in. I told her to put her clothes on and I got dressed. I told her to go on to the house.
The statement was witnessed by Chief Deputy Carver and Deputy Sheriff Charlie Moses.

B.
On May 18, 1987, the grand jury of Leflore County returned an indictment charging Dwayne Veal with the attempted sexual battery of B.A.H., a female person under the age of fourteen years. See Miss. Code Ann. §§ 97-1-7 and 97-3-95 (1972 and Supp. 1987). The Circuit Court transferred the matter to the County Court of Leflore County, where trial was held on January 25, 1988. In the end, the jury found Veal guilty as charged. The Court then sentenced Veal to ten years imprisonment, with the final three years of his sentence suspended. Miss. Code Ann. §§ 97-1-7 and 97-3-101 (1972 and Supp. 1987).
Veal timely moved for a new trial, charging, inter alia, that the jury's verdict "was against the great and overwhelming weight of the evidence." On May 23, 1987, the Court denied the motion. Veal now appeals to this Court.

III.
Veal renews his charge that the verdict was contrary to the overwhelming weight of the evidence and, on this ground, urges that we reverse and remand for a new trial. When he presents such a point, he necessarily argues that the County Court erred when it denied his motion for a new trial. Cantrell v. State, 507 So.2d 325, 331 (Miss. 1987); Malone v. State, 486 So.2d 360, 366 (Miss. 1986). Our standard of review when such a point is presented is as limited as it is familiar. Motions for a new trial challenging the weight of the evidence are committed to the sound discretion of the trial court. On appeal, we do not proceed de novo, nor do we second guess the jury's assessment of the evidence nor its verdict on disputed points of fact. We may not reverse unless we find that court abused its discretion when it denied the motion. Blanks v. State, 542 So.2d 222, 228 (Miss. 1989); May v. State, 524 So.2d 957, 967 (Miss. 1988); Crenshaw v. State, 520 So.2d 131, 135 (Miss. 1988).
We have reviewed the evidence in the record and, having done so, are left with no small disquiet. The case for the prosecution began with the testimony of B.M.H., the victim's eleven-year-old sister. B.M.H. testified that her little sister "went down to Miss Mary's house" and when she *696 came back, "she looked kind of funny." B.M.H. told the jury that, after a while, she was able to get her sister to tell her what had happened, giving blatant but unobjected-to hearsay testimony.[2] B.M.H. said her sister had
said Dwayne Veal called and she didn't come and she said that he came out there and took her by the hand and took her in his room... . She said that he told her to pull down her clothes and he told her to lay in his bed and he got up and he laid on top of her and she said he kissed her in the mouth and he tried to stick his penis in there.
The prosecution then called B.A.H., the seven-year-old victim, who proved disturbingly inarticulate. The witness gave "no response" to no less than twelve out of twenty important questions about Dwayne Veal and what he did, managing to answer only that she went with Veal to his house and inside his room.[3] Unable to elicit further response from B.A.H., the prosecuting attorney, no doubt exasperated, sought to question the prosecutrix from a statement she is said to have given. A chambers hearing followed, and the Court refused to allow this.
The Court then ordered a five-minute recess, at the conclusion of which the prosecuting attorney resumed direct examination of B.A.H. as follows:
Q I am just going to ask you one more, one more question, okay?
A (Inaudible)
Q Is that okay?
A Okay.
Q What did Dwayne try to do?
A (Inaudible)

*697 Q He tried to what?
A Put his penis in my privates.
Q Tried to put his penis in your private?
A Yes.
BY MRS. BOUCHARD: No more questions. Thank you.
Finally, of course, the prosecution offered Dwayne Veal's confession. And that is all!
Having in mind our limited scope of review, we observe first that at trial the Court certainly had discretionary authority to consider the competency of the seven-year-old victim witness. Ryan v. State, 525 So.2d 799, 801 (Miss. 1988); House v. State, 445 So.2d 815, 827 (Miss. 1984). The Court accepted B.A.H. as a competent witness, and Veal does not challenge that ruling. B.A.H.'s testimony in relevant part has been recited. Whatever visceral reaction one might have to it, our law of appellate review provides that this testimony was first and foremost for the jury to hear and evaluate and to believe, if the jury found it worthy of belief.
Second is the testimony of the victim's older sister, B.M.H. This testimony is only slightly more articulate and detailed than that of the victim. Moreover, its form is that of pure hearsay. We are not told why no objection was made on this ground. See Leatherwood v. State, 548 So.2d at 399; Mitchell v. State, 539 So.2d at 1369. The point for the moment is that unobjected-to hearsay evidence, once received by the court and presented to the jury, becomes competent evidence and may aid in supporting a verdict the same as any other competent evidence. Burns v. State, 438 So.2d 1347, 1350 (Miss. 1983); Roberts v. Interstate Life & Accident Ins. Co., 232 Miss. 134, 139, 98 So.2d 632, 635 (1957); Citizens Bank of Hattiesburg v. Miller, 194 Miss. 557, 566, 11 So.2d 457, 459 (1943).
Fortunately, we do not face the question whether the verdict could stand on the testimony of seven-year-old B.A.H. and eleven-year-old B.M.H. alone. Their testimony is corroborated in critical particulars by Veal's confession. This evidence considered in the aggregate, we cannot say that the Court abused its discretion when it denied Veal's motion for a new trial.

IV.

A.
All of this leads to Veal's challenge to the prosecution's use of his confession and highlights the importance of the point. Veal claims he was threatened by his interrogators and that he was of sufficiently weak mind that his confession should be held involuntary and, hence, inadmissible.
The trial court found Veal of sufficient mental capacity and intelligence to give a voluntary confession, that he had been properly advised of his rights, and had voluntarily, knowingly and willingly waived those rights and confessed. On appeal, we give great deference to such findings. McCarty v. State, 554 So.2d 909, 911 (Miss. 1989); Davis v. State, 551 So.2d 165, 169 (Miss. 1989); Layne v. State, 542 So.2d 237, 239 (Miss. 1989).
The trial court's inquiry was whether, under the totality of the circumstances, the Miranda-warned accused knowingly and voluntarily waived his privilege against self-incrimination. Jones v. State, 461 So.2d 686, 696-97 (Miss. 1984); Stevens v. State, 458 So.2d 726, 729 (Miss. 1984); Depreo v. State, 407 So.2d 102, 106 (Miss. 1981). Our questions on appeal are whether the trial court has employed the correct legal standard and, if so, whether the record reflects substantial evidence consistent with the trial court's finding.
We may quickly dispatch Veal's claim of threats. Although Veal suggests, after opening pleasantries, advice of his rights and his initial refusal to confess, the officers assured him of assorted dire consequences if he persisted, there is substantial evidence to the contrary. Deputies Carver, King and Moses all stated no one threatened Veal. Each denied Veal's specific charges. The trial court credited the testimony of these deputies, and we find no grounds for reversing that credit on appeal.
More forcefully, Veal claims he is mentally deficient and that his confession is the legally impermissible product of that *698 deficiency. There is evidence Veal is mildly mentally retarded. His father gave a history of Veal's mental difficulties as far back as when he was seven years old. Deputy Carver admits that, prior to his early morning hour confession-producing interrogation of Veal, he overheard Veal's father explaining to Justice Court Judge Collins that "he might possibly was retarded." Veal flunked three grades in school, but he did graduate from high school. There is no evidence he was ever placed in special education classes. Veal admits he can read and write and that he understood the charges against him. The transcript before us suggests Veal understood well enough to litigate the rights he says he didn't understand well enough to waive. Besides, all who witnessed the interrogation say they saw no evidence Veal suffered mental abnormalities such that he could not understand the interrogation process nor its consequences.
Hearing the above and more, the trial court held Veal "has sufficient mental ability to understand what his rights were and comprehend the information which was given to him." This finding is supported by substantial evidence. The trial court employed the correct legal standards and was within the evidence when it held Veal "knowingly" confessed. Jones v. State, 461 So.2d at 696-97; Stevens v. State, 458 So.2d 726, 729 (Miss. 1984); Neal v. State, 451 So.2d 743, 756 (Miss. 1984); Lee v. State, 338 So.2d 399, 401 (Miss. 1976); Williamson v. State, 330 So.2d 272, 276 (Miss. 1976); Harrison v. State, 285 So.2d 889, 890 (Miss. 1973); Stewart v. State, 273 So.2d 167, 168 (Miss. 1973); Dover v. State, 227 So.2d 296 (Miss. 1969); Harvey v. State, 207 So.2d 108, 116 (Miss. 1968).

B.
Veal argues further that he was overreached because officers offended rights afforded him through Rule 1.04, Miss.Unif.Crim.R.Cir.Ct.Prac. (1979), requiring he be brought before a judge for an initial appearance without undue delay. He suggests officers should have allowed him to go before Judge Collins in the early moments of April 24, 1987, and, in any event, prior to questioning. Because they didn't, Veal says his confession should fall.
While the exact time of arrest is unclear, facts suggest officers apprehended Veal sometime shortly before midnight. Veal promptly received his rights, at first denied all, but soon broke down and confessed his crime. Our law has long respected the law enforcement officer's responsibility to make post-arrest investigations prior to an accused's initial appearance. This is but a function of the care the officer is charged to take to be sure he has the right man. The impracticability of instant initial appearances inform this law, as well. Herring v. State, 522 So.2d 745, 750-51 (Miss. 1988); cf. County of Riverside v. McLaughlin, ___ U.S. ___, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); and W. LaFave & J. Israel, Criminal Procedure § 1.4(d) & (h) (1985). Fortuitous features of today's facts require that we probe further.
Rule 1.04, Miss.Unif.Crim.R.Cir.Ct.Prac. (1979, as amended) provides that "every arrested person shall be taken before a judicial officer without unnecessary delay" for his initial appearance. At the initial appearance, the judicial officer is directed to advise the accused
(1) That the defendant is not required to speak and that any statements he makes may be used against him;
(2) If the defendant is unrepresented, that he has the right to assistance of counsel, and that if he is unable to afford counsel, an attorney will be appointed to represent him;
(3) That the defendant has the right to communicate with counsel, family or friends, and that reasonable means will be provided to enable him to do so.
Veal invoked his rights under Rule 1.04 at his suppression hearing in the Court below. He renews the point here.
His complaint is that he was not taken before a judicial officer "without unnecessary delay." The point takes on poignancy when we realize that Justice Court Judge Johnny Collins was present at the Sheriff's Office when Veal was brought in and as he was being interrogated. Judge Collins had *699 been disturbed at his home after ten o'clock that night, had come to the Sheriff's Office, had issued the arrest warrant, and had remained until after officers had secured Veal's confession. Our cases construing Rule 1.04's "without unnecessary delay" have recognized the practical problems often attendant upon late-night arrests of "lack of access to a judge." Still we have reasoned
Principled policy demands that the judge be considered just as accessible for the defendant's initial appearance as for procuring a search warrant in a felony investigation,
Nicholson v. State, 523 So.2d 68 at 76 (Miss. 1988), or, as here, for procuring an arrest warrant. The point seems to answer itself in that Judge Collins was, indeed, on the scene, and the only reason the officers of the Sheriff's Department did not afford Veal an initial appearance as soon as "custody, booking, administrative and security needs ... [had] been met," Nicholson, 523, So.2d at 76, was that they did not realize Rule 1.04 required such.
Assuming arguendo Veal's rights under Rule 1.04 were offended, relief does not follow. Before questioning, Veal was independently advised of his right to remain silent and of his right to counsel, Miranda variety, facts he freely admits. We have repeatedly held this advice legally adequate that, when followed by a knowing and voluntary waiver, a subsequent confession becomes competent evidence. We doubt there is a court in the land that would, on this record, hold Veal's confession inadmissible, had Judge Collins not been present. We do not see how on principle the judge's presence changes the outcome. Suffice it to say nothing before us suggests the officers' failure to present Veal to Judge Collins for a pre-interrogation initial appearance was the procuring cause of Veal's confession.

C.
We need be clear why right-to-counsel law affords Veal no relief. It is true the right to counsel, both federal and state constitutional varieties, attaches at the point in time when "the initial appearance under Rule 1.04 ... ought to have been held... ." See, e.g., Magee v. State, 542 So.2d 228, 233 (Miss. 1989); Jimpson v. State, 532 So.2d 985, 988 (Miss. 1988); May v. State, 524 So.2d 957, 967 (Miss. 1988); Nicholson v. State, 523 So.2d at 77; Page v. State, 495 So.2d 436, 439 (Miss. 1986); see also, Corley v. State, 536 So.2d 1314, 1317 and particularly n. 1 (Miss. 1988). It appears, in any event, Veal's right to counsel had attached before interrogation began, as he was in custody pursuant to arrest upon a warrant. Livingston v. State, 519 So.2d 1218, 1220 (Miss. 1988); Nixon v. State, 533 So.2d 1078, 1087 (Miss. 1987); Williamson v. State, 512 So.2d 868, 876 (Miss. 1987); Tolbert v. State, 511 So.2d 1368, 1375, n. 5 (Miss. 1987); Page v. State, 495 So.2d 436, 440 (Miss. 1986); Cannaday v. State, 455 So.2d 713, 722 (Miss. 1984); Miss. Code Ann. § 99-1-7 (1972); see also, Corley v. State, 536 So.2d at 1317. But the point is that Veal was advised promptly of his clearly attached right to counsel, and he clearly and promptly waived that right.

D.
There is a final point. Throughout, Veal's father waited in the Sheriff's office outside the interrogation room. Veal says he asked for his father's assistance but was denied such. Freddie Veal says he asked to be present with his son and called two lawyers seeking assistance in that regard. We know Freddie Veal talked with Judge Collins, but it is not clear this conversation went beyond Freddie Veal's view of his son's mental problems.
Dwayne Veal was twenty-two years old on April 24, 1987. As a competent adult, he enjoyed no right to parental assistance during custodial interrogation. What rights he had he received and waived. Yates v. State, 467 So.2d 884, 886-87 (Miss. 1984). See also, Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).
CONVICTION OF ATTEMPTED SEXUAL BATTERY AND SENTENCE OF TEN YEARS IMPRISONMENT WITH THREE YEARS SUSPENDED, AFFIRMED.
*700 ROY NOBLE LEE, C.J., HAWKINS, and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
NOTES
[1] See Rule 1.03, Miss.Unif.Crim.R.Cir.Ct.Prac. (1979); Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966).
[2] See Hosford v. State, 560 So.2d 163, 167 (Miss. 1990); Leatherwood v. State, 548 So.2d 389, 399 (Miss. 1989); and Mitchell v. State, 539 So.2d 1366, 1369 (Miss. 1989).
[3] The colloquy at issue reads as follows:

Q When you were going to Miss Mary's house to buy some candy, who did you see?
A Dwayne Veal.
Q Dwayne Veal? What did Dwayne want?
A (No response)
Q Did Dwayne say something to you?
A (No response)
Q What did Dwayne say, B.?
A (No response)
Q Did you go somewhere with Dwayne?
A (No response)
Q B., did you go somewhere with Dwayne?
A Yes.
Q I couldn't hear you, say it again.
A Yes.
Q Where did you go with Dwayne, whose house?
A His house.
Q His house? You are going to have to speak up real loud, okay? (Microphone adjusted)
Q Can you talk into that microphone?
A Yes.
Q Very good. Okay. Where did you go inside Dwayne's house?
A In his room.
Q What did he want, or what did he tell you inside his room?
A (No response)
Q What did Dwayne say?
A (No response)
Q Can you speak up where I can hear you, B.?
A (No response)
Q Can you talk into the microphone? What did he say or what did he ask you to do inside his room?
A (No response)
Q What did you do in that room?
A (No response)
Q Is there a bed in that room?
A Yes.
Q What did you do about the bed?
A (No response)
Q Can you tell me, B.?
BY MR. GWIN: Judge, if it please the Court, I think that's going a little too far, now. She has asked her three times and she has gotten to the bed and then she goes to the next thing and the witness has not answered yet. I object to this kind of leading.
BY THE COURT: I am going to ... (microphone adjusted)
BY THE COURT: That ought to get it, Mr. Hackelman. Let me interject this. B., you have not answered Mrs. Bouchard's questions and she has asked you a series of questions and you are required to answer those questions if you know the answer to them. So, you need to speak out and answer the question, "Yes", "No" or whatever the answer calls for. All right, Mrs. Bouchard. You can ask the question, but do not suggest the answers. Just ask this young lady and then you respond and tell me and this jury what your answer is. You have got to give us an answer.
BY MRS. BOUCHARD, CONTINUING
Q What did Dwayne do?
A (No response)
Q Can you tell me, B., into the microphone, what did Dwayne do?
A (No response)
Q Look at me.
A (Witness looks at Mrs. Bouchard)